UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

Arie Robert Redeker

Petitioner

v.

Dwight Neven, et al.,

Respondents

2:12-cv-00397-APG-GWF

**Order of Dismissal**

Petitioner Arie Robert Redeker, a prisoner in the custody of the State of Nevada, brings this habeas action under 28 U.S.C. § 2254 to challenge his 2006 Nevada state conviction for second-degree murder with the use of a deadly weapon. After evaluating his claims on the merits, I deny Redeker's petition for a writ of habeas corpus, dismiss this action with prejudice, and deny a certificate of appealability as to all grounds except for Ground 5, as to which I grant a certificate of appealability.

## Background

Tuk Lannon was strangled to death. Arie Robert Redeker was bound over after a preliminary hearing on December 10, 2002, on charges of first-degree murder. (Exhibit 6).[1] The State filed a notice of intent to seek the death penalty nine days later alleging two aggravating circumstances, only one of which survived a petition to the Supreme Court of Nevada for a writ of mandamus: Redeker was under a sentence of imprisonment at the time of the murder, namely that he was on parole. (Exhibit 7; Exhibit 82; Exhibit 83).

Following a jury trial, Redeker was convicted of second-degree murder with the use of a deadly weapon on July 20, 2006. (Exhibit 134; Exhibit 137). He was sentenced to two terms of life

---

[1] The exhibits referenced in this order are found in the Court's record at ECF Nos. 18–22 (Exhibits 1–220), ECF No. 33 (Exhibits 221–247), and ECF No. 60 (Exhibits 248–251).

1

in prison with the possibility of parole after ten years, to run consecutively. (Exhibit 139; Exhibit 140).

Redeker appealed, and the Supreme Court of Nevada affirmed. (Exhibit 152; Exhibit 159). Remittitur issued on February 17, 2009. (Exhibit 162). Redeker filed a petition for a writ of habeas corpus in state court. (Exhibit 174; Exhibit 175). After holding an evidentiary hearing, the state district court denied the petition. (Exhibit 183; Exhibit 184). Redeker appealed, and the Supreme Court of Nevada affirmed. (Exhibit 199; Exhibit 204). Remittitur issued on June 4, 2012. (Exhibit 207).

Redeker then filed a petition for a writ of habeas corpus with this Court. (ECF No. 1). Redeker filed a second amended petition on January 18, 2013. (ECF No. 28). The State moved to dismiss, which I granted in part and denied in part. (ECF No. 41). In response to that order, Redeker elected to abandon the claims that I found unexhausted. (ECF No. 44).[2]

### Standard of review

When a state court has adjudicated a claim on the merits, the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling; that standard is "difficult to meet" and "demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170 (2011). Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Id.* at 202. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court, or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. *Id.* at 181–88. The petitioner bears the burden of proof. *Id.* at 181.

---

[2] Redeker's Declaration (ECF No. 44) says at 2:8-10: "Given the options presented by the order, I therefore elect to fully and forever abandon the Grounds that the Court has deemed unexhausted, and proceed on the unexhausted grounds." Obviously, that is a typographical error as Redeker cannot abandon the unexhausted claims and proceed on those same claims. Based on the context of his Declaration and my prior order, I read his Declaration to say that he has abandoned his unexhausted claims and has elected to proceed on his exhausted claims.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* The Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* And "a federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Id.* at 16. A decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *See, e.g.*, *id.* at 18; *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004). When a state court's factual findings based on the record before it are challenged, the "unreasonable determination of fact" clause of 28 U.S.C. § 2254(d)(2) controls, which requires federal courts to be "particularly deferential" to state court factual determinations. *See, e.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This standard is not satisfied by a mere showing that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), a state court's factual findings are presumed to be correct and the petitioner must rebut that presumption by "clear and convincing evidence." In this inquiry,

3

federal courts may not look to any factual basis not developed before the state court unless the petitioner both shows that the claim relies on either (a) "a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable" or (b) "a factual predicate that could not have been previously discovered through the exercise of due diligence," and shows that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2).

When a state court summarily rejects a claim, it is the petitioner's burden still to show that "there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

## Discussion

### A. Ground 1

In Ground 1, Redeker argues that his "constitutional guarantees of due process, equal protection, and a reliable sentence" were violated "because the trial court refused to strike the aggravating circumstance that the killing was committed 'by a person under sentence of imprisonment.'" (ECF No. 28 at 9). The Supreme Court of Nevada summarily rejected this claim. (Exhibit 159 at 1 n.1). In its notice of intent to seek the death penalty, the State cited the aggravating circumstances that "[t]he murder was committed by a person under sentence of imprisonment." (Exhibit 7 at 1); *see* Nev. Rev. Stat. § 200.033(1). Redeker's "sentence of imprisonment," the State contended, was his five-year period of probation that he was still serving when he committed the murder. (Exhibit 7 at 1).

In *Zant v. Stephens*, 462 U.S. 862 (1983), the Supreme Court held that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Id.* at 877. The aggravator in question here applies only to the "narrow class" of individuals who are on probation (or serving some other sentence of imprisonment) and that reasonably justifies treating them more harshly than others found guilty of the same offense.

4

Someone who commits murder while on probation can reasonably be treated differently than someone who either was never convicted of a crime or no longer on probation. No Supreme Court case clearly says otherwise. And interpretations of state law are outside the scope of a federal habeas court, barring constitutional concerns not raised here. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Notably Redeker was not actually sentenced to death—the jury refused to find him guilty of first-degree murder. Nonetheless, Redeker argues that he was prejudiced. But the U.S. Supreme Court has explicitly rejected that argument. *See Lockhart v. McCree*, 476 U.S. 162 (1986). The Supreme Court of Nevada's rejection of Redeker's claim was in accordance with, rather than contrary to, clearly established U.S. Supreme Court precedent. Redeker contends that social science, relied on in *Lockhart*, now suggests a different outcome. Redeker has not shown that the consensus of the social science community has changed so much in the past thirty years as to render a state court's not-abrogating a holding of a U.S. Supreme Court case an unreasonable application of that case.

Thus, he has failed to meet his burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

Ground 1 provides no basis for habeas relief.

**B.      Ground 2**

In Ground 2, Redeker argues that "the trial court deprived [him] of his right to a fair and impartial jury, a fair trial and due process when it imposed improper and arbitrary limitations on voir dire, in violation of . . . the Fifth, Sixth, and Fourteenth Amendments." Redeker's trial counsel wanted to provide the jury with a juror questionairre about the death penalty, and specifically ask the following question:

> 56. If you were convinced beyond a reasonable doubt that the defendant was guilty of first degree murder, would you say that: (circle one)
>     A. Your beliefs about the death penalty are such that you would <u>AUTOMATICALLY</u> vote <u>IN FAVOR</u> of the Death Penalty regardless of the facts and circumstances of the case.

5

B. Your beliefs about the Death Penalty are such that you would
    AUTOMATICALLY vote AGAINST the Death Penalty regardless of the facts and
    circumstances of the case.

(Exhibit 32 at 25). The trial court denied the motion. Redeker claims that, "[a]s a result of the court's limitation of the voir dire, the defense was unable to properly identify pro-death jurors and jurors who could not consider mitigation." (ECF No. 28 at 11). The Supreme Court of Nevada summarily rejected this claim. (Exhibit 159 at 1 n.1).

The trial judge did not do what Redeker claims. The judge explained that instead of "ambush[ing]" the prospective jurors by giving them a hypothetical and asking them what they would do, defense counsel had to say: "these things will be presented and you are required to consider them, are willing to consider them, or something of that ilk." (Exhibit 123 at 8).

Redeker provides two citations for his assertion that "[t]he court refused to allow counsel to question juror regarding whether they would automatically vote for the death penalty in certain circumstances. Instead, the court limited question to asking jurors only whether they could 'follow the law.'" One citation (Exhibit 123 at 3) is to Redeker's trial counsel's characterization of what happened—a characterization that was rebuffed by both the court and the government. The other (Exhibit 120 at 15-6) has the trial judge asking that question, but nothing more. The record belies Redeker's contention that his counsel was prohibited from asking *any* specific questions. What's more, though, is the specific question that he claims he was not allowed to ask, he did in fact ask, of each juror, many times. He asked the juror in question, "In that sort of instance would you vote for the death penalty automatic?" (Exhibit 120 at 12). He then followed it up by asking "[Would you] start with the assumption of a death penalty?" (*Id.* at 12–13). After more back and forth, the prospective juror came to her decision that she would start with the assumption of a death penalty "[a]s long as it follows the guidelines that we're given." (*Id.* at 13–14). And after the trial judge's questioning, trial counsel came back to the same vein of questions. (*Id.* at 17–19). Trial counsel asked of another juror, near the end of *voir dire*, "I know I've asked everybody this. I want to make sure that everybody has answered this question. . . . [C]ould you consider a sentence less than

6

death?" (*Id.* at 171). The record shows that Redeker's counsel was not improperly prevented from asking questions during voir dire.

Now, Redeker tries to characterize that as requiring defense counsel "to use a peremptory challenge on Juror Boyle instead of dismissing her for cause based on her inability to consider mitigating factors." (ECF No. 59 at 18). Redeker's argument lacks logic. Indeed, right before the page that Redeker cites for that proposition, Juror Boyle explains that she *would* consider a small sentence even though she might start with a presumption toward the death penalty, which, if anything, leads to the conclusion that she would entertain mitigating factors to impose something less than the death penalty. Another juror did, in fact, say that a defendant's background, which is a mitigating factor, "wouldn't have anything to do with it. Just the current charge." Of course, as the judge pointed out, no one had yet told him whether he should consider background and he was just going from his gut. (Exhibit 120 at 171–72). When then asked if he would consider background, he replied, "If the Court tells me to look at it I will look and listen to it. . . . Just mainly on the crime itself." (*Id.* at 172). He explained, "Depends on what you come up with as far as what it is, but I would consider it then . . . ." (*Id.* at 173).

Redeker's factual characterizations are belied by the record. As the record appears to the unadulterated eye, none of the constitutional violations described by Redeker occurred. He has thus failed to meet his burden of showing that "there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. Of course, all these questions only went to whether jurors would automatically assume/impose the death penalty—which Redeker did not receive. And, as discussed above in Ground 1, having a death-penalty eligible jury does constitute prejudice. Redeker's explanations for prejudice would therefore fail in any event.

Ground 2 provides no basis for habeas relief.

**C.     Ground 3**

In Ground 3, Redeker argues that "the trial court admitted evidence of extraneous bad acts in violation of Redeker's right to a fair trial, right of confrontation and due process as guaranteed by the Fifth, Sixth, and Fourteenth Amendments." (ECF No. 28 at 12). Specifically, Redeker contends that

7

the trial court improperly admitted evidence that he was convicted of arson of the home he shared with the victim, Tuk, while it was unoccupied, that he made threatening remarks about the victim to third parties, and that he made inappropriate/threatening remarks about the victim's eight-year-old daughter, B.T. (*Id.*).

Testimony was admitted that Redeker "said he was going to have somebody take care of [Tuk]" (Exhibit 124 at 63); "would say [Tuk] talked too much. She couldn't keep her mouth shut. [Redeker] would call her names" (*Id.* at 74); said "it would be easy to have someone take her out, um, to have her whacked" (*Id.* at 75); said the same thing about B.T. (*Id.* at 84–85); according to a witness who heard it from B.T., "says [B.T. is] a whore, like [her] mom" (*Id.* at 86); and that according to that same witness, Redeker "would refer to [B.T.] by bad names, as well" in conversations with the witness. (*Id.*). Testimony was admitted that the garage of the home that Redeker and Tuk co-owned together was burned via arson in June 2001; Redeker was residing there, but Tuk had moved and was living with her mother and stepfather when the arson occurred. (*Id.* at 103–04; *see id.* at 90; Exhibit 128 at 53). Some time after the arson, Tuk moved back in with Redeker. (Exhibit 124 at 105). She again moved out about three to four weeks before her death. (*Id.* at 93). On cross-examination, defense counsel elicited that Redeker possibly took medication for being bipolar and pleaded guilty to second-degree arson for setting the garage on fire. (*See id.* at 104–05). Lastly, defense counsel elicited that Redeker's parents testified that, perhaps a week before the fire, Redeker was "ranting and raving" and made some threat "to the effect of doing something to the house." (Exhibit 128 at 51–53). After that, he went on medication. (*Id.* at 55). On cross-examination, the State elicited that "he did threaten, you know, again, that he would—he was going to do some harm [to Tuk]," specifically "something to [the] effect" of him saying "that he was going to cut off Tuk's ears and send one to his parents . . . and then one to Tuk's parents" and "that he would kill Tuk and bury her in the desert." (*Id.* at 63–64).

Redeker challenges the admission of this testimony—presumably, only the testimony elicited by the State, but I will analyze it all as if elicited by the State anyway. The Supreme Court of Nevada rejected Redeker's argument. (Exhibit 159 at 10–14). While there might be some confusion

8

as to whether the court addressed Redeker's constitutional argument on its merits (or at all, actually) or "did [not] dispute" the constitutional error and only applied harmless error analysis to reject the claim, I will address the merits de novo assuming that the court did not reach the claim.[3]

The federal courts "are not a state supreme court of errors; we do not review questions of state evidence law." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Instead, the federal courts on habeas review care only "whether the admission of the evidence so fundamentally infected the proceedings as to render them fundamentally unfair," and thus constitutionally impermissible. *Id.* Not only must there be "*no* permissible inference the jury may draw from the evidence," but also the evidence must "be of such quality as necessarily prevents a fair trial." *Id.* at 920 (citation omitted); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998). In other words, the evidence is not constitutionally suspect unless it is irrelevant and has no probative value. *See McGuire*, 502 U.S. at 68–69. Whether the admission of evidence violated state law "is no part of a federal court's habeas review of a state conviction." *Id.* at 67.

None of this evidence was admitted only for an impermissible purpose. As the Supreme Court of Nevada noted, the evidence "was relevant to the crime charged because of it was probative of Redeker's intent and motive to commit murder, as well as his ill will against Tuk." (Exhibit 159 at 12; *see also id.* at 13–14). I agree and therefore find that the admission of the evidence did not render the trial fundamentally unfair.

Redeker also argues that the admission of the statement that Redeker called B.T. a "whore, like [her] mom," violated his rights under the Confrontation Clause. A witness testified that B.T. had told her that Redeker said that to B.T. (*See* Exhibit 124 at 86). The witness also testified that Redeker "would refer to [B.T.] by bad names, as well" in conversations with the witness. (*Id.*). In light of the minor effect that such a statement would have on the verdict and the fact that the witness corroborated similar statements in statements that did not run afoul of the Confrontation Clause,

---

[3] My reading of its affirmance is that the Supreme Court of Nevada did not address Redeker's argument that the introduction of the evidence violated his federal constitutional rights. Rather, it addressed only whether the admission of the evidence was proper under Nevada state law. (*See* Exhibit 159 at 10–14).

9

even if the statement from B.T. violated the Confrontation Clause, the error was harmless beyond a reasonable doubt. *See United States v. Brooks*, 772 F.3d 1161, 1171 (9th Cir. 2014); *Chapman v. California*, 386 U.S. 18, 24 (1967).

Ground 3 provides no basis for habeas relief.

**D.     Ground 5**

In Ground 5, Redeker argues that the "trial court erroneously admitted Redeker's statements to police and confession to Detective Hardy, in violation of Redeker's Fifth Amendment right to remain silent." (ECF No. 28 at 16).

The police received a tip that about a missing person (Tuk) and Officers Jensen and Burnett, in full uniforms, went to Tuk and Redeker's co-owned home to investigate and perform a welfare check. (Exhibit 46 at 53, 64, 94). Around 10:15 pm, Redeker arrived at his house in a white SUV that belonged to Tuk while the officers were across the street parked along the curb, and after he drove past the house, Burnett shouted, "Arie, stop." (*Id.* at 62). After a pause, the vehicle stopped, Redeker got out, and Burnett put him in handcuffs for safety given his prior history of domestic violence, mental health, and arson. (*See id.* at 62–63; 99–100). When asked if he knew the whereabouts of Tuk, he responded that Tuk had given him her car, the white SUV, around 4:30 pm, after which they got into an argument about "the child" and she drove away. (*See id.* at 64–66). Burnett removed the handcuffs about twenty minutes after the initial stop so that Redeker could sign a consent form allowing the officers to search the house and the car to see if they could find any leads in helping locate Tuk. (*See id.* at 70–73). While the officers were looking around, Redeker was left "to meander around the front yard," sometimes sitting in a chair smoking cigarettes and eating McDonalds, all the while "[s]omebody kept an eye on him." (*Id.* at 80–81, 101, 117). Redeker asked to go inside the house; but he was not allowed to do so. (*See id.* at 89). Jensen and Burnett explained that if Redeker had asked to leave, they would not have let him. (*Id.* at 92, 104).

Detective Jackson arrived around midnight. (*Id.* at 124). Around 1:00 am, Jackson asked Redeker if he could talk with him about trying to find a missing person. Redeker agreed, and they spoke in Jackson's car—although it is unclear if Redeker was in the front seat or the back seat. (*Id.* at

10

115–16). Redeker was not the most responsive, and oftentimes did not reply to Jackson's questions. Jackson told him that he was not under arrest. (*Id.* at 116; Exhibit 250 at 12 ("You have to talk to me. You know you're not under arrest here. You're not bein' accused of anything.")). Jackson said that if Redeker wasn't "tired of trying to help [the police] find her," "then go on and talk to me real quick [because] anytime you make a police report, with a missing person or what, you have to make a statement. You have to do that." (Exhibit 250 at 12–13). Jackson offered and Redeker accepted two cigarettes. (*Id.* at 14–15). Redeker muttered, "please, go to bed," and later asked to go into the house, but Jackson said that he couldn't go back in there right now. (Exhibit 250 at 26, 31). Jackson told Redeker that he was "gonna be out here for a long time . . . because at this point, you're not bein' helpful to me at all." (*Id.* at 28). On the other hand, though, after Redeker had been unhelpful for a while, Jackson said that "when you wanna talk to me . . . we can talk." (*Id.* at 31). Redeker ended up explaining that he and Tuk had gotten into a verbal argument, Tuk handed him the car keys, and then she walked away—he stated that he had not harmed her in any way. (*Id.* at 32–33). The interview lasted for about an hour, ending at 1:58 am. (Exhibit 46 at 117). Jackson testified that if Redeker had asked to leave, he would not have let him. (*Id.* at 126). Around 2:30am, homicide detectives arrived. (*Id.*).

Detective Hardy arrived at 3:40 am, left with Redeker around 4:00 am, and ultimately interviewed Redeker at the police station at 4:30 am. (*Id.* at 150). When Hardy arrived, Redeker was sitting in a folding chair on his front walkway with cigarette butts and a bag of food. (*Id.* at 133). Hardy testified that he asked, exactly, "Would you come to the station so that we can talk about this incident away from the scene, talk to us about the incident at our office?" (*Id.* at 141). Redeker agreed and rode in the front seat of Hardy's car without handcuffs—as Redeker's car was still under police control from when Redeker consented to having it searched. (*See id.* at 142–43). Once at the station, Hardy and his partner walked Redeker to a room—a five-foot-by-five-foot room with three chairs and a small table. Redeker sat down in one of the chairs upon walking in. The door was not locked, Hardy got Redeker a soda, and Redeker was not told that he was being taped. (*See id.* at 146–49). Hardy testified that it was a "consensual encounter," that he should have "fel[t] free [to]

leave," and that "[i]f he got up to walk out, I would let him walk out." (*Id.* at 148). After Hardy asked Redeker some basic biographical questions, he asked him where Tuk was living and what happened between Tuk and him. (Exhibit 251 at 1–4). Redeker drew him a map and admitted to strangling her. (*See id.* at 5–6; *see also* Exhibit 128 at 12). Hardy then *Mirandized* Redeker, and Redeker elaborated on what had happened to Tuk. (*See* Exhibit 251 at 6–7).

Redeker argues that he was in custody for purposes of *Miranda* for the entirety of the evening and that, therefore, nothing he said that night before the *Miranda* warning should have been used against him at trial nor should the statement he made after being *Mirandized* been used because the pre-*Miranda* statements tainted the *Miranda* waiver. The Supreme Court of Nevada rejected Redeker's arguments. (Exhibit 159 at 5–14). It held that he was not in custody for purposes of *Miranda* before he was read his *Miranda* rights, rejected Redeker's argument that the initial detention morphed into a custodial arrest at the house, and refused to hold any of his statements inadmissible. (*See id.*). Redeker responds that the court's decision is not entitled to deference under AEDPA because it "contains several critical misstatements of fact as to material factual issues." (ECF No. 59 at 29–30). Indeed, "where the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to a material factual issue that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004); *see also Milke v. Ryan*, 711 F.3d 998, 1008 (9th Cir. 2013). I will assume for the sake of argument that the factual errors that Redeker points to for the first time in his Reply brief are, in fact, errors and that they warrant jettisoning AEDPA's deferential standard of review. But reviewing Redeker's claim de novo, I find that he was not in custody for purposes of *Miranda* at the challenged times.

*Miranda* warnings are required only if someone is subject to a "custodial interrogation." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). Redeker was clearly being interrogated, and so the only question is whether he was "in custody," which is an objective inquiry. *Id.* "The benefit of the objective custody analysis is that it is 'designed to give clear guidance to the police.'" *Id.* at 271 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004)).